1
2
3
4
5
6
7                    **UNITED STATES DISTRICT COURT**

8                    **CENTRAL DISTRICT OF CALIFORNIA**

9

10   DANIEL VERGU,                    )        NO. ED CV 06-1203 FMO
                                      )
11                  Plaintiff,        )
                                      )
12            v.                      )        **ORDER Re:  JOINT STIPULATION**
                                      )
13   MICHAEL J. ASTRUE,               )
     COMMISSIONER OF SOCIAL           )
14   SECURITY ADMINISTRATION,         )
                                      )
15                  Defendant.        )
     _____ )

16

17                         **PROCEEDINGS**

18            Plaintiff filed a Complaint on November 1, 2006, seeking review of the denial by the

19   Commissioner of the Social Security Administration ("Commissioner") of his application for

20   Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act ("Act").  42

21   U.S.C. § 405(g).  Thereafter, the parties consented to proceed before the undersigned United

22   States Magistrate Judge.  On August 16, 2007, the parties filed a Joint Stipulation ("Joint Stip.").

23   The court has taken the matter under submission without oral argument.

24          **THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

25            To be eligible for disability benefits, a claimant must demonstrate a medically determinable

26   impairment which prevents the claimant from engaging in substantial gainful activity and which is

27   expected to result in death or to last for a continuous period of at least 12 months.  42 U.S.C.

28   § 423(d)(1)(A); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).

Disability claims are evaluated using a five-step test:

| | | |
|---|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two. |
| Step two: | Does the claimant have a "severe" impairment? If so, proceed to step three.   If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1?  If so, the claimant is automatically determined to be disabled.  If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled. |

20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4); Tackett, 180 F.3d at 1098-99.  If a claimant is found "disabled" or "not disabled" at any step, there is no need to complete further steps.  20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4); Tackett, 180 F.3d at 1098.

**BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

Plaintiff, who was 42 years of age on the date of his last administrative hearing, has a high school education. (See Administrative Record ("AR") at 19, 24, 26, 213 & 532).[1] His past relevant work includes employment as a certified nurse's aide and a security guard.  (Id. at 24 & 213).

Plaintiff filed for DIB on September 23, 2003, alleging that he has been disabled since February 19, 2001, due to back pain.  (See AR at 19, 30 & 85-87).  Plaintiff's application was denied initially and upon reconsideration, after which he filed a timely request for a hearing.  (Id. at 19, 26-27 & 38).

On July 21, 2005,  plaintiff, represented by counsel, appeared and testified at a hearing before an Administrative Law Judge ("ALJ").  (AR at 19, 487, 492-518 & 521-27).  Plaintiff's wife,

---

[1] There is a notation in the AR that plaintiff's initial case folder was lost.  (See AR at 112). Thus, the court relies primarily on the Administrative Law Judge's decision and notations in plaintiff's medical records for information regarding his disability application and vocational data.

Magdalena Vergu, also appeared and testified.[2]  (Id. at 19 & 519-20).  The hearing was continued in order to obtain additional medical records, (see id. at 527-28), and a second hearing was held on October 11, 2005, in which plaintiff, represented by counsel, appeared and testified.  (Id. at 19, 530, 541-46 & 555-58).  Dr. Samuel Landau, a medical expert ("ME"), Dr. David M. Glassmire, an ME, and Sandra M. Fioretti, a vocational expert ("VE"), also testified.  (Id. at 19, 534-41 & 546-61).

The ALJ denied plaintiff's request for benefits on January 23, 2006.  (AR at 19-25).  Applying the five-step sequential evaluation process, the ALJ found, at step one, that plaintiff has not engaged in substantial gainful activity since his alleged onset date of disability.  (Id. at 21).  At step two, the ALJ found that plaintiff:

> has the following impairments which are deemed "severe," both individually and in combination: ischemic heart disease, status post angioplasty and stent placement; degenerative disc disease of the lumbar spine, status post fusion and removal of internal fixation hardware; controlled hypertension; history of mild chronic obstructive pulmonary disease secondary to long term smoking improved with inhaler treatment; and chronic alcohol dependence and abuse with anxiety and depressive disorder, not otherwise specified.

(Id.) (bold omitted).  At step three, the ALJ determined that the evidence does not demonstrate that plaintiff's impairments, either individually or in combination, meet or medically equal the severity of any listing set forth in the Social Security regulations.[3]  (Id. at 23).

The ALJ then assessed plaintiff's residual functional capacity[4] ("RFC").  (See AR at 23).  Specifically, the ALJ made the following findings regarding plaintiff's RFC:

---

[2]    The hearing transcript refers to plaintiff's spouse as "Peggy" Vergu.  (AR at 487 & 519).

[3]    See 20 C.F.R. pt. 404, subpt. P, app. 1.

[4]    Residual functional capacity is what a claimant can still do despite existing exertional and nonexertional limitations.  Cooper v. Sullivan, 880 F.2d 1152, 1155 n. 5 (9th Cir. 1989).  "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149, 1151 n. 2 (9th Cir. 2007).

1                Physically, [plaintiff] is able to lift, carry, push, or pull twenty pounds

2                occasionally, and ten pounds frequently; stand or walk 2 out of 8 hours; and

3                sit 6 out of 8 hours, with customary breaks.  [Plaintiff] is occasionally able to

4                stoop, crouch, and climb ramps and stairs.  [Plaintiff] is not able to kneel,

5                squat, crawl, and climb ladders, scaffolds, and ropes.  [Plaintiff] should avoid

6                all exposure to hazards such as unprotected heights or dangerous moving

7                machinery.  [Plaintiff] should not operate motorized equipment, and have no

8                responsibility for the safety of others. [¶] Mentally, absent the effects of his

9                alcohol dependent and abuse, the claimant is able to understand and

10               remember simple instructions, and carry out simple (5-step) tasks.  [Plaintiff]

11               is able to have occasional interaction with the general public.  [Plaintiff] is

12               unable to perform jobs with a high level of responsibility; and is unable to

13               work at a production-rate pace, [i.e.], assembly-line or conveyor-belt work.

14  (Id.) (bold omitted).  Based on plaintiff's RFC and the VE's testimony, the ALJ found, at step four,

15  that plaintiff "is unable to perform any past relevant work."  (Id. at 24) (bold omitted).  At step five,

16  based on plaintiff's RFC, vocational factors and the VE's testimony, the ALJ determined that

17  plaintiff is "capable of making a successful adjustment to other work that exists in significant

18  numbers in the national economy[,]" including work as a bench assembler, inspector-packer, and

19  sedentary assembler.  (See id. at 25).  Accordingly, the ALJ concluded that plaintiff was not

20  suffering from a disability as defined by the Act.  (Id. at 20 & 25).

21        Plaintiff filed a timely request for review of the ALJ's decision, which was denied by the

22  Appeals Council.  (AR at 7-10 & 16).  The ALJ's decision stands as the final decision of the

23  Commissioner.

24                          **STANDARD OF REVIEW**

25        Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny

26  benefits.  The ALJ's findings and decision must be upheld if they are free of legal error and

27  supported by substantial evidence.  Mayes v. Massanari, 276 F.3d 453, 458-59 (9th Cir. 2001, as

28  amended Dec. 21, 2001).  If the court, however, determines that the ALJ's findings are based on

1  legal error or are not supported by substantial evidence in the record, the court may reject the

2  findings and set aside the decision to deny benefits. <u>Aukland v. Massanari</u>, 257 F.3d 1033, 1035

3  (9th Cir. 2001); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1147 (9th Cir. 2001).

4       "Substantial evidence is more than a mere scintilla, but less than a preponderance."

5  <u>Aukland</u>, 257 F.3d at 1035.  Substantial evidence is such "relevant evidence which a reasonable

6  person might accept as adequate to support a conclusion."  <u>Reddick v. Chater</u>, 157 F.3d 715, 720

7  (9th Cir. 1998); <u>Mayes</u>, 276 F.3d at 459.  To determine whether substantial evidence supports the

8  ALJ's finding, the reviewing court must review the administrative record as a whole, "weighing both

9  the evidence that supports and the evidence that detracts from the ALJ's conclusion." <u>Mayes</u>, 276

10  F.3d at 459.  The ALJ's decision "'cannot be affirmed simply by isolating a specific quantum of

11  supporting evidence.'"  <u>Aukland</u>, 257 F.3d at 1035 (quoting <u>Sousa v. Callahan</u>, 143 F.3d 1240,

12  1243 (9th Cir. 1998)).  If the evidence can reasonably support either affirming or reversing the

13  ALJ's decision, the reviewing court "'may not substitute its judgment for that of the ALJ.'"  <u>Id.</u>

14  (quoting <u>Matney ex rel. Matney v. Sullivan</u>, 981 F.2d 1016, 1018 (9th Cir. 1992)).

15                              **DISCUSSION**

16  I.    THE ALJ IMPROPERLY EVALUATED THE MEDICAL EVIDENCE.

17       Plaintiff contends that the Commissioner improperly evaluated the medical evidence by

18  failing to provide adequate reasons for rejecting the opinions of plaintiff's treating physician, Dr.

19  G. Sunny Uppal ("Dr. Uppal"), and the examining psychologist, Dr. Margaret A. Donohue ("Dr.

20  Donohue").  (<u>See</u> Joint Stip. at 4-8).

21        In evaluating medical opinions, Ninth Circuit case law and Social Security regulations

22  "distinguish among the opinions of three types of physicians: (1) those who treat the claimant

23  (treating physicians); (2) those who examine but do not treat the claimant (examining physicians);

24  and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  <u>Lester v.</u>

25  <u>Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995, <u>as amended</u> April 9, 1996); <u>see also</u> 20 C.F.R.

26  §§ 404.1527(d) & 416.927(d) (prescribing the respective weight to be given the opinion of treating

27  sources and examining sources).  "As a general rule, more weight should be given to the opinion

28  of a treating source than to the opinion of doctors who do not treat the claimant." <u>Lester</u>, 81 F.3d

1    at 830; accord Benton ex rel. Benton v. Barnhart, 331 F.3d 1030, 1036 (9th Cir. 2003).  This is so

2    because a treating physician "is employed to cure and has a greater opportunity to know and

3    observe the patient as an individual."  Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987).

4         Where the treating physician's "opinion is not contradicted by another doctor, it may be

5    rejected only for 'clear and convincing' reasons."   Benton, 331 F.3d at 1036; see also Andrews

6    v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) ("While the ALJ may disregard the opinion of a

7    treating physician, whether or not controverted, the ALJ may reject an *uncontroverted* opinion of

8    a treating physician only for clear and convincing reasons.") (italics in original).  "Even if the

9    treating doctor's opinion is contradicted by another doctor, the [ALJ] may not reject this opinion

10   without providing specific and legitimate reasons supported by substantial evidence in the

11   record[.]"  Lester, 81 F.3d at 830 (internal quotation marks and citation omitted); accord Reddick,

12   157 F.3d at 725.

13        "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion

14   of a nonexamining physician."  Lester, 81 F.3d at 830; see also 20 C.F.R. §§ 404.1527(d)(1)-(2)

15   & 416.927(d)(1)-(2).  If the opinion of an examining physician is rejected in favor of the opinion of

16   a nonexamining physician, the ALJ may do so only by providing specific and legitimate reasons.

17   Lester, 81 F.3d at 830-31.  The ALJ can meet the requisite specific and legitimate standard "by

18   setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating

19   his interpretation thereof, and making findings."  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.

20   1989) (internal quotation marks and citation omitted).  Finally, "[t]he opinion of a nonexamining

21   physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion

22   of either an examining physician *or* a treating physician."  Lester, 81 F.3d at 831 (italics in original);

23   accord Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (ruling that "the report of [a]

24   non-treating, non-examining physician, combined with the ALJ's own observance of claimant's

25   demeanor at the hearing[]" did not constitute "substantial evidence" and, therefore, did not support

26   the Commissioner's decision to reject examining physician's opinion).

27   / / /

28   / / /

1    A.    Treating Physician.

2         Dr. Uppal began treating plaintiff on May 6, 2003, for low back, right buttock and leg pain

3    that was initially caused by a work injury plaintiff suffered in 2001, and exacerbated by a more

4    recent bicycle accident.  (See AR at 138).  Dr. Uppal prescribed pain medication and ordered

5    diagnostic tests.  (See id. at 139).  On July 29, 2003, Dr. Uppal noted that the results of

6    "EMG/nerve conduction studies . . . show there is peripheral neuropathy."[5]  (Id. at 136).  On

7    September 11, 2003, Dr. Uppal stated that an MRI of plaintiff's back indicated "a herniated disc

8    . . . [and] weakness of the gastrocnemius-soleus."[6]  (Id.).  On November 18, 2003, Dr. Uppal

9    indicated that nonoperative treatment had failed to alleviate plaintiff's pain and, after discussing

10   various treatment options with plaintiff, it was determined that plaintiff would undergo back surgery.

11   (See id. at 135).  On December 29, 2003, Dr. Uppal performed a multi-procedure surgery on

12   plaintiff's lumbar spine that involved bone grafting and the insertion of screws to fuse the injured

13   area.  (See id. at 183-88).

14        On January 14, 2004, Dr. Uppal became upset with plaintiff when he learned that shortly

15   after the surgery, plaintiff was admitted to the hospital for symptoms related to alcohol withdrawal,

16   whereas before the surgery plaintiff denied any alcohol use.  (See AR at 226).  On August 31,

17   2004, Dr. Uppal recommended that, because plaintiff continued to have low back pain, he should

18   undergo another surgery to remove the screws from his spine.  (See id. at 221-22).  However, Dr.

19   Uppal indicated that the hardware removal surgery should not take place until January 2005, to

20   permit plaintiff sufficient time to recuperate from his heart surgery on August 20, 2004, where a

21   _____

22        [5]    "Peripheral neuropathy describes damage to the peripheral nervous system, which
     transmits information from the brain and spinal cord to every other part of the body.  [¶] More than
23   100 types of peripheral neuropathy have been identified, each with its own characteristic set of
     symptoms, pattern of development, and prognosis.  Impaired function and symptoms depend on
24   the type of nerves – motor, sensory, or autonomic – that are damaged.  Some people may
     experience temporary numbness, tingling, and pricking sensations, sensitivity to touch, or muscle
25   weakness.  Others may suffer more extreme symptoms, including burning pain (especially at
     night), muscle wasting, paralysis, or organ or gland dysfunction."  National Institute of Neurological
26   Disorders and Stroke, http://www.ninds.nih.gov.

27

28        [6]    The gastrocnemius and the soleus are muscles in the calf and foot.  See Stedman's
     Medical Dictionary 708 & 1632 (26th ed. 1995).

1   stent was placed in one of plaintiff's arteries to alleviate blockage.  (See id.; see also id. at 270-71

2   (operative report of plaintiff's heart surgery on August 20, 2004)).  On January 24, 2005, Dr. Uppal

3   removed the screws from plaintiff's lumbar spine.  (See id. at 330-31).

4         On March 30, 2006, Dr. Uppal completed a Multiple Impairment Questionnaire that was

5   submitted to the Appeals Council following denial of plaintiff's disability application by the ALJ.

6   (See AR at 479-86; see also id. at 7-10).  Dr. Uppal stated that he has treated plaintiff every four

7   to six weeks for approximately three years and that plaintiff's primary symptoms are chronic low

8   back and leg pain which causes fatigue.  (See id. at 479-80).  Dr. Uppal also provided that he has

9   been unable to completely relieve plaintiff's pain with medication without unacceptable side

10  effects.  (Id. at 481).  Regarding plaintiff's functional limitations, Dr. Uppal opined that plaintiff can

11  sit, stand and walk for up to one hour in an eight hour day, but is unable to sit, stand or walk

12  continuously in a work setting.  (Id. at 481-82).  Plaintiff is able to frequently lift up to 10 pounds,

13  occasionally lift up to 20 pounds, and is significantly limited in his ability to do repetitive reaching,

14  handling, fingering or lifting.  (Id. at 482).  Plaintiff is also precluded from pushing, pulling, kneeling,

15  bending and stooping.  (Id. at 485).  In addition, Dr. Uppal indicated that plaintiff is unable to

16  engage in full-time competitive employment and his symptoms would likely increase if he was

17  placed in a competitive work environment.  (Id. at 483-84).  Dr. Uppal further opined that plaintiff's

18  pain, fatigue and other symptoms would frequently interfere with his ability to concentrate and

19  would cause him to miss more than three days of work per month.  (See id. at 484-85).  Finally,

20  Dr. Uppal provided that plaintiff is not malingering his symptoms.  (Id. at 484).

21        B.    Examining Physician.

22        On June 1, 2004, Dr. Donohue performed a complete psychological evaluation of plaintiff.

23  (See AR at 212-17).  Dr. Donohue diagnosed plaintiff with major depression, moderate in severity,

24  and a history of alcohol abuse in reported remission.  (Id. at 216).  Dr. Donohue opined that

25  plaintiff is able to follow simple one and two-step instructions that require understanding and

26  memory, but may have difficulty with complex instructions due to psychomotor slowing and

27  depressed mood.  (Id.).  She further stated that plaintiff may have some difficulty interacting

28  appropriately with other people including the general public because of his irritability due to

8

1    depression. (Id.). Finally, Dr. Donohue provided that plaintiff may have some difficulty maintaining

2    adequate attention, concentration, pace and persistence and that with treatment plaintiff's

3    depression should resolve in six to twelve months. (Id.).

4         C.    Analysis.

5         In determining plaintiff's physical RFC, the ALJ relied on the opinion of Dr. Landau, one of

6    the testifying MEs. (Compare AR at 23 with id. at 536-37). In his discussion of the medical

7    evidence concerning plaintiff's physical limitations, the ALJ stated that plaintiff's "orthopedic status

8    prior to May 2003 was not associated with any clearly serious findings, and the treating orthopedic

9    surgeon findings that led to the spinal fusion surgery in December 2003 were primarily subjective

10   and quite questionable given the surgeon's unawareness of [plaintiff]'s underlying alcohol

11   dependence and abuse and the surgeon's obvious umbrage about [plaintiff]'s lack of candor about

12   the alcohol abuse problem prior to the spinal surgery." (Id. at 23). The ALJ did not consider the

13   Multiple Impairment Questionnaire completed by Dr. Uppal because plaintiff submitted this

14   evidence for the first time to the AC. (See id. at 7-8; see also Joint Stip. at 5). In denying

15   plaintiff's petition for review, the AC rejected Dr. Uppal's opinion, stating that "[t]he questionnaire

16   from Dr[.] Uppal does not contain objective findings that support the limitations described." (AR

17   at 8).

18        In assessing plaintiff's mental RFC, the ALJ relied on the opinion of Dr. Glassmire, one of

19   the testifying MEs. (Compare AR at 23 with id. at 550-53). The ALJ did not specify whether he

20   adopted or rejected the findings of Dr. Donohue regarding plaintiff's mental limitations. (See,

21   generally, id. at 19-25). In fact, the ALJ's only discussion of Dr. Donohue's assessment was that

22   "the findings of the consultative psychiatric evaluation in June 2004 . . . have shown that [plaintiff]'s

23   cognitive functioning is within normal limits, and his functional impairments are not disabling[.]"

24   (Id. at 23). The RFC adopted by the ALJ, however, is inconsistent with some of Dr. Donohue's

25   findings. For example, the ALJ found that plaintiff could perform simple 5-step tasks and imposed

26   no limitations concerning plaintiff's ability to maintain attention, concentration, persistence and

27   pace. (Compare id. at 23 with id. at 216 (Dr. Donohue's opinion that plaintiff "can follow simple

28   one and two-step instructions" and "may have some difficulty maintaining adequate attention,

9

1  concentration, pace, and persistence[]").  Thus, the ALJ implicitly rejected portions of Dr.

2  Donohue's opinion.  See Smith ex rel. Enge v. Massanari, 139 F.Supp.2d 1128, 1133 (C.D. Cal.

3  2001) (reliance on one physician's opinion in making a finding, which differs from that of another

4  physician, is an implicit rejection of the latter).

5       The Commissioner erred in his evaluation of the medical evidence.  First, the court notes

6  that neither Dr. Uppal's nor Dr. Donohue's opinions appear to be contradicted by any other

7  medical evidence in the record.  (See, generally, AR at 1-562).  Therefore, the ALJ was arguably

8  required to provide clear and convincing reasons for rejecting any portion of the uncontradicted

9  opinions of plaintiff's treating doctor and the examining physician.  See Reddick, 157 F.3d at 725

10  ("Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only

11  for clear and convincing reasons supported by substantial evidence in the record.") (internal

12  quotation marks and citation omitted); Lester, 81 F.3d at 830 ("[T]he Commissioner must provide

13  'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician.")

14  (internal citation omitted).  However, because the ALJ failed to provide even specific and legitimate

15  reasons supported by substantial evidence for his rejection of plaintiff's treating physician's and

16  the examining physician's opinions, it follows that the ALJ's analysis also failed to meet the higher

17  standard of clear and convincing reasons.

18       Second, to the extent the ALJ rejected Dr. Uppal's and Dr. Donohue's findings, none of the

19  reasons he provided are legally sufficient and/or supported by substantial evidence.  There is no

20  evidence in the record to support the ALJ's assertion that Dr. Uppal based his recommendation

21  that plaintiff undergo spinal surgery solely on plaintiff's subjective complaints.  (See AR at 23).

22  To the contrary, Dr. Uppal's treatment records reflect that Dr. Uppal's decision to operate was

23  based upon objective medical findings and his clinical observations of plaintiff after treating him

24  for over seven months.  (See id. at 131-39).  The ALJ also failed to explain how plaintiff's lack of

25  candor in failing to tell Dr. Uppal about his alcohol use before the December 2003 surgery, renders

26  Dr. Uppal's findings invalid.  (See id. at 23).  In fact, even after learning of plaintiff's alcohol use

27  in early January 2004, (see id. at 133), Dr. Uppal continued to opine that plaintiff was significantly

28  limited by his physical impairments and not malingering his symptoms.  (See, e.g., id. at 220-25,

10

1  254-58 & 479-86).  Moreover, the ALJ failed to provide any reason, let alone a specific and

2  legitimate one, for his implicit rejection of Dr. Donohue's opinion.  See Lester 81 F.3d at 830-31.

3

4        Finally, the AC's rejection of Dr. Uppal's assessment on the basis that it was not supported

5  by objective findings, (see AR at 8), is belied by the record.  At the time he submitted the

6  questionnaire, Dr. Uppal had been treating plaintiff for nearly three years. (See id. at 479; see also

7  id. at 131-39, 220-25 & 254-58).  During this period, plaintiff underwent extensive objective testing

8  related to his spinal injury, including EMG/nerve conduction studies, x-rays and MRIs.  (See, e.g.,

9  id. at 131-39, 220-25 & 254-58).  Further, Dr. Uppal indicated in the questionnaire the specific

10 objective laboratory and diagnostic tests that support his opinion concerning the extent of plaintiff's

11 functional limitations. (See id. at 480).  Thus, the Commissioner's rejection of Dr. Uppal's opinion

12 is not supported by substantial evidence.

13 II.    REMAND IS APPROPRIATE.

14       The court has discretion to remand or reverse and award benefits.  McAllister v. Sullivan,

15 888 F.2d 599, 603 (9th Cir. 1989, as amended Oct. 19, 1989).  Where no useful purpose would

16 be served by further proceedings, or where the record has been fully developed, it is appropriate

17 to exercise this discretion to direct an immediate award of benefits. See Benecke v. Barnhart, 379

18 F.3d 587, 595-96 (9th Cir. 2004); Harman v. Apfel, 211 F.3d 1172, 1179-80 (9th Cir. 2000, as

19 amended May 4, 2000), cert. denied, 531 U.S. 1038, 121 S.Ct. 628 (2000).  Where there are

20 outstanding issues that must be resolved before a determination can be made, and it is not clear

21 from the record that the ALJ would be required to find plaintiff disabled if all the evidence were

22 properly evaluated, remand is appropriate.  See Benecke, 379 F.3d at 595-96; Harman, 211 F.3d

23 at 1179-80.

24       Here, remand is required because the Commissioner erred in his evaluation of the medical

25 evidence.  In light of the court's determination, it is not necessary to reach plaintiff's remaining

26 contention that the ALJ erred in his evaluation of plaintiff's subjective complaints and the lay

27 witness testimony. (See Joint Stip. at 12-14).  The court does note, however, that on remand, if

28 the ALJ chooses to reject plaintiff's pain testimony, he must provide clear and convincing reasons

1  for doing so.  See Benton, 331 F.3d at 1040 (absent a finding of malingering, ALJ must provide

2  clear and convincing reasons for disregarding plaintiff's excess pain testimony).  Moreover, the

3  ALJ shall reassess plaintiff's wife's testimony and her Third Party Questionnaire, (see AR at 103-

4  11 & 519-20), and if the ALJ chooses to reject any of her statements, he must provide specific

5  reasons germane to the witness for doing so.  See Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir.

6  2001) ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take

7  into account, unless he or she expressly determines to disregard such testimony and gives

8  reasons germane to each witness for doing so.").

9      In addition, on remand, the ALJ shall reassess the medical opinions in the record and

10 provide sufficient reasons under the applicable legal standard for rejecting any portion of the

11 medical opinions.  The ALJ must then consider all of plaintiff's impairments in determining

12 plaintiff's RFC.  Next, the ALJ shall, at step five, assess plaintiff's capacity to perform other work

13 existing in significant numbers in the regional and national economies.  Finally, the ALJ shall

14 "conduct the five-step inquiry without separating out the impact of alcoholism or drug addiction."

15 Bustamante v. Massanari, 262 F.3d 949, 955 (9th Cir. 2001).  "If the ALJ finds that the claimant

16 is disabled and there is medical evidence of . . . [his] drug addiction or alcoholism, then the ALJ

17 should proceed under [20 C.F.R.] §§ 404.1535 or 416.935 to determine if the claimant would still

18 be found disabled if . . . []he stopped using alcohol or drugs."  Id. (internal quotation marks,

19 alterations and citation omitted); Lindsay v. Barnhart, 370 F. Supp.2d 1036, 1044 (C.D. Cal. 2005)

20 (observing that it is "it is reversible error for an ALJ to attempt to separate out the impact of a

21 claimant's alcohol abuse before determining whether the claimant is disabled[]").

22      This decision is not intended for publication.

23      Based on the foregoing, IT IS ORDERED THAT judgment shall be entered **reversing** the

24 decision of the Commissioner denying benefits and **remanding** the matter for further

25 administrative action consistent with this decision.

26 Dates this 28th day of September, 2007.

27                                    /s/
                                   Fernando M. Olguin
28                                 United States Magistrate Judge